# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| L&J ASSET HOLDINGS, LLC, | CASE NO. 8:23-cv-44 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| CITY OF BELLEVUE and CITY OF BELLEVUE BOARD OF EQUALIZATION, | |
| Defendants. | |

L&J Asset Holdings, LLC ("L&J"), as and for its complaint against the City of Bellevue ("City") and City of Bellevue Board of Equalization ("BOE"), alleges as follows:

## NATURE OF THE ACTION

1.       In early 2019, Nebraska suffered its worst flooding event in 50 years.  Floodwaters breached levees and damaged private property throughout the state.  The President of the United States declared a major disaster in 84 of Nebraska's 93 counties and authorized the Federal Emergency Management Agency ("FEMA") to offer financial assistance.  *See* Nebraska; Major Disaster and Related Determinations, 84 Fed. Reg. 13678 (Apr. 5, 2019).

2.       That damage was acute surrounding the mobile-home park that is the subject of this action ("Property").  Floodwaters inundated the mobile homes located at the Property ("Mobile Homes"), rendering them permanently uninhabitable from water damage, mold, and other hazardous substances.  FEMA awarded a reimbursement grant to the City for demolition and removal of the Mobile Homes.

3.       The Mobile Homes did not belong to L&J but instead belonged to private mobile-home owners who leased spaces on the

1

Property ("Mobile Home Owners").  It was those Mobile Home Owners whose mobile homes and other property, if any, were demolished and removed.  Indeed, FEMA at one point even assigned liability to those Mobile Home Owners, requiring the City to collect reimbursement from them if any was available or if any insurance proceeds were available. But the City deemed it unlikely that it could recover anything from them.  The City instead set its sights on the new owner of the Property, deciding that L&J should pay for the "demolition & removal" of the Mobile Homes.  The BOE, on behalf of the City, levied a $798,560.00 special assessment against the Property.  For good measure, the City tacked on an interest rate of 14 percent per annum.  That scheme of specially assessing one owner for another owner's costs has no support in law, and indeed statutes prohibit it.

4.     The Property consists of three legally and physically distinct parcels.  But the City variously levied each and only one of those parcels.  This was strategic.  The City first tried to levy each parcel, causing the special assessment to triple.  Payoff inexplicably ballooned beyond $3,000,000.  When L&J questioned this, the City backtracked and selectively levied the special assessment, plus already-accumulated interest, against only one lot.  Convenient for the City, that levied parcel was the one that L&J needed to begin renovating first.  The City singled L&J out and intentionally prevented L&J's economic use of the Property.  Payoff climbed above $1,000,000 and counting.  In retaliation for L&J's rightful refusal to pay, the City threatened "additional" amounts.  If not paid in "full," the City threatened to foreclose and acquire the Property for its own.

5.     Trying to compound its leverage for a payoff, the City concurrently stonewalled L&J's ability to use the Property, denying all economically beneficial or productive use.  As the City Attorney acknowledged, the City adopted an official policy to withhold all permits for the Property until L&J pays the unrelated, irrelevant, and unlawful special assessment.  The City even bragged about this unlawful action to local media.  To L&J's knowledge, no similarly situated property

owner was treated this poorly by the City. The City violated L&J's constitutional rights.

## PARTIES

6. L&J, a Black-owned business, is a Delaware limited liability company doing business in Bellevue, Nebraska.

7. All of L&J's members reside in states other than Nebraska.

8. L&J owns the Property, which consists of three legally distinct parcels, identified by the Sarpy County Treasurer for assessment purposes as 011587744 ("Lot 1"), 011587745 ("Lot 2"), and 011587746 ("Lot 3").

9. Lots 1, 2, and 3 are all within the corporate boundaries of the City.

10. The City is a municipal corporation and a city of the first class of the State of Nebraska.

11. The BOE is a political tribunal of the City.

## JURISDICTION AND VENUE

12. The amount in controversy exceeds $75,000, and complete diversity of citizenship exists. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343, and 1367.

13. This action is authorized and instituted pursuant to 28 U.S.C. §§ 2201-2202, 42 U.S.C. §§ 1983 and 1985, Neb. Rev. Stat. §§ 25-21,149, 76-296, and 77-1727, and U.S. Const. amends. V and XIV.

14. This Court has personal jurisdiction and venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because the real property at issue is in this district, the special assessment was levied and filed in this district, the defendants are all located in this district, and the events giving rise to this dispute occurred in this district.

## GENERAL ALLEGATIONS

15. The legal boundaries of a mobile-home park are distinct from those of other individually platted residential subdivisions. That is because a mobile-home park owner owns only the underlying real property, not the mobile homes themselves. Mobile Home Landlord and Tenant Act, Neb. Rev. Stat. § 76-1450 *et seq.*; *see generally Yee v. City of Escondido, Cal.*, 503 U.S. 519, 523 (1992).

16.     The mobile-home park owner develops real property that it makes "available to the general public for the placement thereon of mobile homes for occupancy." § 76-1464; *accord* 178 Neb. Admin. Code § 001.01C (applying that definition of "mobile home park" for State licensing purposes).

17.     The residents, in turn, own their mobile homes and all accessories and are responsible for maintenance and repair of the same. Neb. Rev. Stat. § 76-1471 ("Tenant shall mean an owner of a mobile home who leases or rents space in a mobile home park, but shall not include a person who rents or leases a mobile home.").

18.     Put differently, the mobile-home park and mobile homes are legally and physically distinct.  A mobile-home park owner has no ownership interest in the mobile homes themselves.

19.     Unlike the mobile-home park, which is real property, the mobile homes are personal property, owned by the tenants.  *Id.*; *see Thomas v. Countryside of Hastings, Inc.*, 2 Neb. App. 590, 595, 512 N.W.2d 660, *rev'd on other grounds*, 246 Neb. 907, 524 N.W.2d 311 (1994); *Jeffres v. Countryside Homes of Lincoln, Inc.*, 220 Neb. 26, 30, 367 N.W.2d 728, 731 (1985); *Gates v. Howell*, 204 Neb. 256, 264-65, 282 N.W.2d 22, 26-27 (1979); *see also Roberson v. Manning*, 268 P.3d 1090, 1096 (Alaska 2012) ("A mobile home is personal property, as opposed to real property ….").

20.     L&J acquired the Property, a mobile-home park, in 2020 after the nearby levee had been reinforced to prevent any recurrence of the 2019 flooding event.

21.     L&J only ever owned the Property.  L&J's Property consisted only of the land and ground-level and subterranean infrastructure, including the concrete streets and driveways, curbs and gutters, waterlines, sewer lines, fire line systems, sewer lift stations, power lines, service lines, gas lines, street signs, street lights, and a storm system.  *See e.g.* Neb. Rev. Stat. § 76-1464 (defining "mobile home park").

22.     The Mobile Homes, by contrast, consisted of factory-certified dwelling structures built on steel chasses and fitted with

wheels, along with related accessories including the structure's internal connections to utilities, skirting, decks, garages and carports, storage sheds, gutters and downspouts, and movable concrete pier blocks. *See e.g.* § 76-1463 (defining "mobile home").

23.     The Mobile Homes were owned exclusively by the Mobile Home Owners (and their lenders and other creditors, if any).

24.     L&J was assessed taxes on the basis of Lots 1, 2, and 3. Each of the Mobile Home Owners was assessed on the basis of that party's Mobile Home.

25.     L&J never held any interest in any of the Mobile Homes.

26.     L&J's mission was to revitalize the Property to provide safe, affordable housing in the form of leasable mobile-home spaces for new factory-certified manufactured homes.

27.     Because the Property is adjacent to Offutt Air Force Base, L&J anticipated leasing many of the mobile-home spaces to members of the armed forces.

28.     Sarpy County, and the City in particular, has a "great need" for safe, affordable housing. *See Develop*, Housing Foundation for Sarpy County, *available at* https://www.sarpyhousing.org/development/whatwedo/develop.html (last viewed Jan. 30, 2023).

29.     But for the City's actions, L&J would have helped to meet that need. The project would have afforded safe, affordable housing to the community and an acceptable profit to L&J.

## A.     Special Assessment

30.     On August 31, 2020, the BOE, on behalf of the City, issued Resolution BOE No. 2020-0831-01, a true and correct copy of which is attached and incorporated herein as Exhibit A.

31.     The BOE's purported authorities for the resolution were Neb. Rev. Stat. §§ 16-707 and 18-1722 and Bellevue City Code §§ 8-41 to 8-52.

32.     Exhibit B incorporates a true and correct certified copy of Bellevue City Code §§ 8-41 to 8-52. In pertinent part, it provides:

Should the owner refuse, or neglect, to promptly comply with an order of the city council to tear down and remove a building or structure condemned as a public nuisance, or place the premises in a safe condition, the building official shall proceed with the tearing down and removal of such building or structure, and/or the removal from such premises of the remaining debris and he shall place the premises in a safe condition. He shall dispose of and remove from the premises all materials, rubbish, and debris and leave the premises in a safe condition. A statement of the cost of such work shall be transmitted to the city council, which is authorized to levy the cost as a special assessment against the land. Such special assessment shall be a lien on the real estate and shall be collected in the manner provided for special assessments according to state statutes.

33. The resolution purported to levy a $798,560.00 special assessment, plus an interest rate of 14 percent per annum, against the Property.

34. That amount, according to the resolution, was for the City's "demolition & removal of debris, and/or general property clean-up efforts" throughout "the following properties."

35. The resolution next listed Lots 1, 2, and 3. A diagram atop the resolution, however, attributed $798,560.00 to Lot 1 only.

36. By "debris," the resolution meant the Mobile Homes and their contents owned by the Mobile Home Owners.

37. Indeed, to the extent that the City had any lawful basis for the special assessment, that basis was solely the condition of the Mobile Homes, and not the Property itself.

38. The Mobile Home Owners, not L&J, owned the Mobile Homes and rented the spaces in which their Mobile Homes were located.

39. At most, the Mobile Homes were damaged by the flooding. The Property, by contrast, was no more hazardous or unsafe than other

similarly situated real property throughout Nebraska's 84 of 93 counties that likewise experienced flooding.

40. The City even acknowledged this, at least initially. The City solicited and obtained right-of-entry agreements from many of the Mobile Home Owners to inspect the Mobile Homes. By contrast, neither L&J nor any of its predecessors in interest ever executed any right-of-entry agreements or otherwise authorized the City to inspect the Property following the 2019 flooding.

41. Describing the basis for its special assessment in a May 23, 2019, letter, the Administrative Secretary for the City's Public Works Administration, on behalf of the City, referenced only the Mobile Homes. Exhibit C incorporates a true and correct copy of the City's letter.

42. In the letter, the City wrote:

> A residential area consisting of approximately 200 manufactured or modular homes was inundated by flood waters on March 15, 2019[,] and some of the homes contained flood water between eight and nine feet for approximately two weeks. On March 28-29, 2019[,] the [City] placed placards on the manufactured homes stating these homes were deemed unsafe or unfit for human occupancy due to the damage and contaminates [sic] from the flood waters. All manufactured or modular homes that were damaged as a result of the flood have been deemed uninhabitable[,] and their factory certifications are no longer valid. Without a valid certification[,] these homes must be removed. … After City Council approves the Resolution condemning the dwellings on Lot 1, Lot 2, and Lot 3, Paradise Park, Sarpy County, Nebraska, the [City] will proceed with our normal procurement policy to seek bids for the demolition and debris removal. The debris will be hauled to an approved landfill site and fully documented.                (Emphases              omitted.)

43. Pictures attached to the letter showed exactly what the City intended to demolish and remove: the Mobile Homes, partially submerged under floodwaters, throughout Lots 1, 2, and 3.

44. Infrastructure comprising the Property, by contrast, was not similarly damaged by the water.

45. Another attachment to the letter depicted the City Police Department's message to owners of the Mobile Homes after the flood: "If a citizen's dwelling requires demolition, *it is the responsibility of the owner* to present a path forward with the direction they intend to take to correct the issue ..." (emphasis supplied).

46. Before engaging in demolition of the Mobile Homes, the City disclosed that it was attempting to contact at least some of the Mobile Home Owners to inquire whether they had received compensation from other sources. *See* Phil Davidson, *City Attempting to Contact Former Paradise Lakes Property Owners in Order to Secure FEMA Demolition Funding*, City of Bellevue (Feb. 7, 2020), *available at* https://bellevue.net/information/news/city-attempting-to-contact-former-paradise-lakes-property-owners-in-order-to-secure-fema-demolition-funding-17?utm_source=dlvr.it&utm_medium=twitter (last viewed Jan. 30, 2023). This is an admission that the City, at one point, viewed the Mobile Home Owners as responsible for the Mobile Homes' cleanup.

47. Accordingly, upon information and belief, between 20 and 40 of the Mobile Homes were demolished out of their owners' pockets. The City was willing to place responsibility on those Mobile Home Owners who could pay.

48. Then, on June 18, 2019, the City Council condemned the remaining Mobile Homes. Exhibit D incorporates true and correct copies of Resolutions Nos. 2019-15, 2019-16, and 2019-17, as well as minutes from the meeting during which those resolutions were approved.

49. The resolutions stated that "the buildings or structures [the Mobile Homes] be and hereby are determined under Section 8-50 of

the Bellevue City Code to be a public nuisance, unsafe for human occupancy because of its unsafe unsanitary and dangerous condition."

50. The resolutions next listed the mobile-home spaces and, for each space, clarified that the "IMP ONLY" constituted the public nuisance.

51. "IMP ONLY," which was short for "improvements only," referred to the Mobile Homes alone rather than the Property itself.

52. No similar resolution was ever made regarding the Property.

53. Indeed, after the flooding event, the City and State officials inspected the infrastructure comprising the Property and deemed its condition acceptable and requiring only minor renovations. L&J completed those renovations itself and, on that basis, received its mobile-home-park license from the state.

54. The City never made any finding, nor could it have reasonably found, that the land and permanent infrastructure comprising the Property was worthy of condemnation, a public nuisance, unsafe for human occupancy, or otherwise in need of "demolition & removal."

55. The City, at most, had legal authority for "demolition & removal" of the Mobile Homes, but never the Property itself.

56. The City, at most, had legal authority to specially assess costs to the Mobile Home Owners, but not L&J.

**B. Reimbursement Grant**

57. The resolution was already the City's second attempt to recover its costs. It had previously received a reimbursement grant from FEMA covering any and all of the City's costs.

58. Per FEMA's own guidance, FEMA grants "don't have to be repaid." *See Does Help from FEMA Have to be Paid Back?*, FEMA, *available at* https://www.fema.gov/node/does-help-fema-have-be-paid-back (last viewed Jan. 30, 2023).

59. FEMA approved the City's application for a reimbursement grant on November 6, 2019. Exhibit E incorporates a true and correct copy of FEMA's approval letter.

60.     FEMA's letter specifically noted that the City's costs were only attributable to the Mobile Homes, not the Property: "The City … did not request demolition and debris removal from *non-residential commercial property*. They are specifically excluded from this letter and/or approval" (emphasis supplied).

61.     At another point, FEMA's letter emphasized, "This approval is specifically limited to the damages directly caused by flooding and resulting from the demolition and debris removal from *residential private property* as described above" (emphasis in original).

62.     FEMA regulations do not typically permit grants for private-property debris removal on commercially owned residential property. *See Public Assistance Program and Policy Guide*, FEMA, at 109 (v. 4 Jun. 1, 2020), *available at* https://www.fema.gov/sites/default/files/documents/fema_pappg-v4-updated-links_policy_6-1-2020.pdf (last viewed Jan. 30, 2023) ("Debris removal from residential property is usually not in the public interest.").

63.     Consequently, as a condition of approval, FEMA required the City to try to recoup some of the reimbursement grant:

> FEMA notes that the Bellevue City Code [§§ 8-44 and 8-52] permits the City Council to levy the cost of demolition and debris removal as a special assessment/lien against the real estate. …
>
> Utilizing these provisions of the Bellevue City Code provides an opportunity to offset the general rule limiting [private property debris removal] on commercially owned residential property. Therefore, as a condition to the approval of [private property debris removal] on residential structures within Paradise Park, FEMA requires that the City place such a special assessment/lien for the cost of demolition and debris removal against the land. When, and if, such costs are recouped by the City, such recoupment would be immediately due to FEMA.

64.     The City failed to recoup these funds from the Mobile Home Owners themselves.

65.     Upon information and belief, FEMA did not understand that only the Mobile Home Owners (and their lenders and other creditors, if any) had any legal interest in the Mobile Homes.

66.     The City effectively used FEMA so that the City could not only collect FEMA funding, but then use that funding as a foil to specially assess the Property and threaten foreclosure and the City's taking of L&J's private property.

67.     Even if FEMA believed the scheme was lawful, its interpretation of state law is irrelevant to this Court's interpretation. *In re Shire PLC*, 633 S.W.3d 1, 36 (Tex. App. 2021) ("[C]ourts are not bound by a federal agency's interpretation of state law."); *see also Wichita Royalty Co. v. City National Bank*, 306 U.S. 103, 109 (1939) (holding that in interpreting state law, courts are not bound by decisions of federal courts of appeal).

68.     This scheme of specially assessing L&J for the Mobile Home Owners' costs has no support in law, and indeed state law prohibits it.

69.     FEMA cannot enforce an illegal obligation.  If this Court voids or vacates the special assessment, the City will have no legally enforceable obligation to repay FEMA.

**C.     Manipulating the Special Assessment**

70.     Nevertheless, the City tried a number of leverage tactics to force L&J to pay for the unwarranted and illegal special assessment.

71.     On September 1, 2020, the City Clerk, on behalf of the City, sent a letter requesting that the Sarpy County Treasurer "record a lien of the full $798,560.00 for *each* of Lot 1 …, Lot 2 …, and Lot 3 …" (emphasis added).  Exhibit F incorporates a true and correct copy of the City Clerk's letter.

72.     Stated differently, the "full" amount was to be levied three times, once for each parcel.

73.     Upon information and belief, the Sarpy County Treasurer and its legal staff questioned the legality of this action.

74.     Upon information and belief, Sarpy County Treasurer representatives told L&J that they have never seen a special assessment levied in a similar manner.

75.     Following the City's insistence, however, the Sarpy County Treasurer recorded three liens as directed.  This tripled the principal. Each lien, in turn, collected interest.

76.     As of June 21, 2022, the payoff amount for the special assessment was $3,002,147.97.

77.     After L&J raised the issue, the then-City Attorney, Alicia Bree Robbins, realized that the special assessment was unlawful. (Although Alicia Bree Robbins is no longer the City Attorney, Plaintiff will herein refer to her as the "City Attorney," because she took the pertinent actions in that role.)

78.     In a letter dated June 23, 2022, the City Attorney acknowledged that the special assessment was "showing up as three separate liens for [the full] amount."  A true and correct copy of the City Attorney's letter is attached and incorporated herein as Exhibit G.

79.     The City Attorney announced that it would instead direct the Sarpy County Treasurer to modify the special assessment or re-levy it anew as "$798,560.00 plus interest, total."

80.     In doing so, the City Attorney, on behalf of the BOE and City, failed to follow the procedure required by Neb. Rev. Stat. §§ 16-707 and 18-1722 and Bellevue City Code §§ 8-44 and 8-52 for modifying or re-levying the special assessment.

81.     Rather, the City Attorney asked the Sarpy County Treasurer, via a personal email, if "there [was] a way to change the records on your end to show $798,560 on Lot 1 (plus the 14% interest) …?" Exhibit H incorporates a true and correct copy of this email request, dated June 21, 2022.

82.     As directed, the Sarpy County Treasurer redirected $798,560.00, plus already-accumulated interest, against Lot 1 only.

83.     This selective levy against Lot 1 was strategic.  Upon information and belief, the City Attorney and City knew that to prepare any of the Property to be leased for affordable housing, L&J needed to

begin renovating Lot 1 first. Lot 1 was a required place of ingress and egress to the Property and the location across which utilities must enter the Property.

84. As of January 26, 2023, the payoff amount, according to the Sarpy County Treasurer, was $1,067,795.03 and counting.

85. That included $269,235.03 of interest, allegedly accumulated since the date of the resolution, August 31, 2020.

86. In addition, the City Attorney's June 23, 2022, letter warned that the City would levy an "additional" $305,040.00 fee upon the Property.

87. According to the letter, these were "additional [amounts] owed." But the City Attorney did not offer any basis for the amount, explain why it was only now being added, or specify when and under what conditions it would be levied.

88. Upon information and belief, the City's scheme of stacking these amounts, coupled with its attempt to retroactively include an "additional" $305,040.00 fee, was the City's attempt to intimidate L&J into performing an unlawful act.

89. By letter, the City Attorney then threatened to raise the stakes even higher. The City Attorney, on behalf of the City, demanded that L&J "pay the full amount of the special assessment …, including any accumulated interest," or else the City will "take legal action." Exhibit I incorporates a true and correct copy of this letter, dated July 8, 2022.

90. By "legal action," City Attorney meant that the City will foreclose upon and take the Property as its own.

91. Upon information and belief, this foreclosure threat has been the City's aim all along. To obtain FEMA funding, the City misled FEMA regarding the special assessment's legality, and now the City is using that special assessment to unlawfully take L&J's private property.

**D. Preventing any Construction**

92. In addition to threatening foreclosure, the City has, in retaliation for L&J's rightful refusal to pay the unlawful special

assessment, for more than a year prevented L&J from putting the Property to any economically beneficial or productive use.

93. To update, upgrade, and renovate existing infrastructure on the Property, L&J needs an encumbered title to the Property as well as certain permits from the City.

94. But the City has prevented this first by encumbering L&J's title to the Property.

95. Moreover, as the City Attorney acknowledged in its June 23, 2022, letter, the City has since at least October 2021 withheld all permits for the Property until L&J pays the special assessment in "full."

96. The Mayor also asserted this position on behalf of the City in public statements. *See e.g.* John Chapman, *Heartland Flood: Demolition of Paradise Lakes Delayed*, 6 News WOWT (Sept. 27, 2022), *available at* https://www.wowt.com/2022/09/27/heartland-flood-demolition-paradise-lakes-delayed/ (last viewed Jan. 30, 2023) ("The mayor says now the new owners can't get permits until a lien that is on the property is worked out.").

97. For instance, L&J on May 27, 2022, made a lawful application to the City for an electrical permit to repair certain street lights and install electrical equipment for the existing sewer-lift station on the Property. Exhibit J incorporates a true and correct copy of the permit application.

98. But in an email dated June 2, 2022, the Chief Building Inspector, on behalf of the City, flatly denied L&J's permit application: "At this time[,] no permits are being issued for this address due to an unpaid lien on the [P]roperty that is owed to the [City]." Exhibit K incorporates a true and correct copy of the permit denial.

99. A purported lien-payoff requirement is unrelated and irrelevant to any permits at the Property, much less to the permit at issue.

100. Acknowledging the same, the denial did not allege that the permit application had failed to meet the criteria of Bellevue City Code. It admitted that no matter the contents of any permit application made

by L&J, the City would flatly deny the same due to the unrelated special assessment.

101.    This unlawful position was and remains official City policy.

**E.    Denial of Economically Beneficial or Productive Use**

102.    The City's unlawful actions have needlessly prevented L&J's renovation of the Property and caused certain lenders to deny L&J loans secured by the Property.

103.    If not for those unlawful actions by the City, L&J would have already been able to renovate and lease some or all of the spaces on the Property for affordable housing.

104.    Indeed, the City is the lone impediment to L&J's preparation of the Property for leasing. Recognizing the merit of L&J's project, other State and county regulators have granted L&J the necessary permits and approvals.

105.    Even if L&J made new loan applications after elimination of the encumbrance, any loan would have an elevated interest rate and transaction costs and would be delayed.

106.    The City's unlawful actions have proximately and foreseeably caused significant injury to the Property's potential for producing income and L&J's expected profit therefrom.

107.    The City's unlawful actions have denied all economically beneficial and productive use of the Property.

108.    Damages to L&J's use of the Property have accrued and will continue to accrue each day since the special assessment was first levied and especially since the City unilaterally halted all construction at the Property.

109.    What is more, upon information and belief, the City intends to use its unlawful special assessment to foreclose on the Property, wrongfully dispossess L&J, and acquire title to the Property for the City's own purposes and all at no cost to the City. This has been the City's aim all along.

110. To protect itself and its Property, L&J has, contemporaneously with this action, submitted a Notice of Lis Pendens for recording with the Sarpy County Register of Deeds.

111. Upon information and belief, no other landowner has been issued a similar special assessment, denied a permit by the City due to an unpaid special assessment or related fee, or deprived of loan commitments due to a similarly unlawful encumbrance on real property.

112. The City has treated L&J differently and worse than any other similarly situated landowner.

**COUNT I: DECLARATORY AND INJUNCTIVE RELIEF**

113. This paragraph incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

114. For more than a century, the Nebraska Supreme Court has held that a special assessment is subject to collateral attack even if finalized and not challenged via the statutory-appeal procedure. *E.g. Foote Clinic, Inc. v. City of Hastings*, 254 Neb. 792, 580 N.W.2d 81 (1998); *Christensen v. City of Tekamah*, 230 Neb. 576, 432 N.W.2d 798 (1988); *Grube v. City of Ogallala*, 223 Neb. 640, 392 N.W.2d 380 (1986); *Reiser v. Hartzler*, 213 Neb. 802, 331 N.W.2d 523 (1983); *Nebco, Inc. v. Speedlin*, 198 Neb. 34, 251 N.W.2d 710 (1977); *Midwest Dev. Corp. v. City of Norfolk*, 192 Neb. 475, 222 N.W.2d 566 (1974); *Wiborg v. City of Norfolk*, 176 Neb. 825, 127 N.W.2d 499 (1964); *Wead v. City of Omaha*, 124 Neb. 474, 247 N.W. 24 (1933); *John v. Connell*, 71 Neb. 10, 98 N.W. 457 (1904); *see Chicago & N.W. Ry. Co. v. City of Omaha*, 156 Neb. 705, 713, 57 N.W.2d 753, 757 (1953) ("[D]ecisions of this court have settled the proposition that a taxpayer is not limited to a direct appeal from the finding of an assessing body but may in a proper case resort to collateral attack.").

115. A special assessment is subject to collateral attack for actual or constructive fraud, a fundamental defect, a lack of jurisdiction, or a significant disconnect between the amount specially assessed and the benefit to the property conferred. *Wead v. City of Omaha*, 124 Neb. 474, 247 N.W. 24, 26 (1933); *see e.g. Benesch v. City of Schuyler*, 5 Neb. App. 59, 555 N.W.2d 63 (1996) (voiding a special assessment for costs to pave a gravel road when the statute only permitted such costs to pave bare roads).

116. Municipal corporations can only levy special assessments when, and to the extent, authorized by the Legislature. *Chicago & N.W. Ry. Co. v. City of Omaha*, 154 Neb. 442, 447, 48 N.W.2d 409, 412 (1951); *Falldorf v. City of Grand Island*, 138 Neb. 212, 292 N.W.2d 598, 602 (1940).

117. Every reasonable doubt as to the limitation of a city's authority to levy special assessments, and the manner of exercise, must be resolved in favor of the taxpayer. *Johnson v. City of Fremont*, 287 Neb. 960, 965, 845 N.W.2d 279, 284 (2014).

118. A city that does not strictly follow the statutory steps for levying a special assessment lacks any authority or jurisdiction for the special assessment. *Besack v. City of Beatrice*, 154 Neb. 142, 146, 47 N.W.2d 356, 359 (1951); *see Foote Clinic, Inc.*, 254 Neb. at 796, 580 N.W.2d at 84 (collecting cases).

119. A court must interfere to prevent a consummation of injustice when it is plainly and palpably manifest from the physical condition of the property involved, its locality, environment, character of the work or improvement, assessment, and from the very nature of things, that the special assessment is an exaction from the property owner of a contribution which he should not be obliged to make in that capacity. *Chicago & N.W. Ry. Co.*, 156 Neb. at 717-721, 57 N.W.2d at 759-760.

## A.  Levying Costs Unattributable to L&J's Property

120. In the City's own words, the special assessment is based on the "demolitions & removal of debris," meaning the Mobile Homes. But L&J's Property is legally and physically distinct from the Mobile Homes. L&J owns the Property, and the Mobile Home Owners own the Mobile Homes. There is no overlap. The City cannot lawfully require L&J to pay to demolish and remove the Mobile Home Owners' property. That would be like prosecuting a homeowner for the unsightly condition of her neighbor's car. It ignores the legal boundaries of private property. As the Bellevue Police Department acknowledged at one time, the Mobile Homes are the "responsibility of the [Mobile Home] owner[s]," not L&J. The special assessment against L&J's Property is void.

121.    Another reason that the special assessment is void is that the City never designated, or had, a factual basis therefor.    As a prerequisite to any special assessment, Neb. Rev. Stat. §§ 16-707 and 18-1722 and Bellevue City Code §§ 8-41 to 8-52 require the City to designate a building or structure as unsafe or a public nuisance and order the owner of that building or structure to remove it.    But the Property itself was never unsafe or a public nuisance.    Indeed, the City and State inspectors found as much following inspections.    Moreover, only the Mobile Homes were ever declared a public nuisance, condemned, and ordered removed.    In the City's own words, the sole public nuisance was the "IMP ONLY," meaning the Mobile Homes alone. The City, at most, had legal authority to condemn the Mobile Homes, but never the Property itself.    Absent that authority, the City's special assessment was void.

122.    The City cannot recover again what it has already recovered from FEMA.    FEMA's November 6, 2019, letter, which the City has admitted through public-records requests is its only evidence of an alleged obligation to FEMA, stipulates that the City need only repay FEMA "*if,* and when" the City recovers any costs (emphasis supplied).    Accordingly, *if* the City does not recover anything, FEMA will take no recourse against the City.    The City has already been made whole by the reimbursement grant.    The City is, in essence, using FEMA money to hold the Property ransom until the City can foreclose and take the Property for its own.

123.    As a matter of state law and FEMA directive, the City was required to diligently seek and recover reimbursement for at least a portion of the cleanup costs from the Mobile Homes Owners, their lenders and other creditors, if any, and insurance proceeds that they collected.    But the City failed to do so.    The City's aim all along was to use FEMA funding to target the Property with special assessment and threatened foreclosure.

124.    FEMA has charged the City no interest for its reimbursement grant.    The City thus has no grounds to require interest of L&J, let alone in the amount that it has demanded.

125. The City knew or should have known that the special assessment was unlawful. But the City still levied it to encumber L&J's title to the Property. This was done for the purpose of slandering L&J's title to the Property. The City violated Neb. Rev. Stat. § 76-296.

**B.    Distorting the Property Encumbered and Amount Owed**

126.    In Resolution BOE No. 2020-0831-01, the City sought to make the special assessment attributable to all three of Lots 1, 2, and 3. But the City has since distorted the Property's physical and legal facts to its own ends. It has tried to apply the "full" amount first against each of those lots individually and second against only Lot 1. The City should have known better. It violated Neb. Rev. Stat. §§ 16-707, 18-1722, and 76-296 and Bellevue City Code §§ 8-44 and 8-52.

127.    Upon information and belief, this is the only time that the City or any other taxing authority in Sarpy County has ever assessed multiple parcels collectively and required the payoff of all just to redeem one among them. This was opportunistic and unlawful. The special assessment is not being collected "in the manner as other special assessments." Neb. Rev. Stat. §§ 16-707 & 18-1722; Bellevue City Code §§ 8-44 & 8-52.

128.    The special assessment does not constitute a levy "against *the lot or real estate* upon which the building or structure is located." Neb. Rev. Stat. §§ 16-707 & 18-1722; Bellevue City Code §§ 8-44 & 8-52 (emphasis added).

129.    Indeed, for any one of Lots 1, 2, or 3, about two thirds of the "debris" were on other lots. Their demolition and removal provided no "special benefit" to the lot or real estate in question. Neb. Rev. Stat. §§ 16-707 & 18-1722; Bellevue City Code §§ 8-44 & 8-52.

130.    FEMA's November 6, 2019, letter required the City to record "[t]he type, location, and volume of debris removed and disposed … on a site-by-site basis. GPS coordinates (decimal degrees) should be provided with photograph or video documentation." Additionally, to reasonably comply with Neb. Rev. Stat. §§ 16-707 and 18-1722 and Bellevue City Code §§ 8-44 and 8-52, the City needed to document the costs that actually corresponded to each space and parcel. But, upon

information and belief, the City did not. Any accounting after the fact would thus be impossible. The entire amount of the special assessment must be invalidated.

## C.     Disregarding Fundamental Procedure

131.    Regardless of whether the City Attorney's June 23, 2022, letter modified the existing special assessment or re-levied a new special assessment, it needed to comply with fundamental procedures.

132.    Statutes provide no mechanism for unilaterally and via personal email amending a special assessment encumbrance upon real property after it is already in place. That would be anathema to due procedure. Rather, only the formal levy of a new special assessment could have created or modified the bounds of the initial levy. That is especially so when resolving all reasonable doubts as to the statutory limits of the City's authority in favor of L&J. *See Johnson*, 287 Neb. at 965, 845 N.W.2d at 284; *see also Grube v. City of Ogallala*, 223 Neb. 640, 643, 392 N.W.2d 380, 383 (1986) (evaluating the timeliness of a challenge based on "the date of the [formal] levy of the special assessment").

133.    Such formal levy needed to comply strictly with Neb. Rev. Stat. §§ 16-707 and 18-1722 and Bellevue City Code §§ 8-44 and 8-52. *See Foote Clinic, Inc.*, 254 Neb. at 796, 580 N.W.2d at 84; *Besack*, 154 Neb. at 146, 47 N.W.2d at 359. But even after realizing the initial levy was unlawful, the City flouted those requirements: the BOE did not, for instance, consider whether to modify or re-levy the special assessment; no lawful basis was stated; no notice preceded it; no open session was held; no opportunity to appear and object was allowed; no vote was taken by a majority or even a quorum of the BOE; and no public record was made. The City Attorney, acting on behalf of the City, usurped due process and failed to comply with statutory requirements.

134.    What is more, interest on the special assessment has allegedly accumulated since August 31, 2020, when the BOE first issued the resolution. This ignores the City Attorney's intervening attempt to modify or re-levy the special assessment on June 23, 2022. Even if the City Attorney's effort was legally valid (which it was not), interest

cannot have accumulated since before June 23, 2022, when the current special assessment was allegedly levied.

135. Any discrepancy between the benefit actually conferred and the amount specially assessed is cause to vacate or at least decrease the special assessment. *Johnson*, 277 Neb. at 489, 763 N.W.2d at 110. Not only was the City's special assessment grossly disproportionate to any benefit conferred, the City caused affirmative damage to the Property while engaging in "demolition & removal" of the Mobile Homes.

136. The special assessment exhibits actual or constructive fraud, a fundamental defect, or a lack of jurisdiction. It is plainly and palpably manifest that it is unjust. This Court should intervene to protect L&J, thereby declaring the special assessment void and enjoining the City and all of its agents, representatives, and political tribunals from attempting to enforce or collect the same.

### COUNT II: CONSTITUTIONAL VINDICATION

137. This paragraph incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

138. In addition to invalidating the special assessment and prohibiting its enforcement, this Court has authority under 42 U.S.C. §§ 1981-1988 to award damages, attorneys' fees, court costs, and expert fees to L&J. *See Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 683, 515 N.W.2d 401, 405 (1994), *disapproved of on other grounds by Scofield v. State, Dep't of Nat. Res.*, 276 Neb. 215, 753 N.W.2d 345 (2008).

139. Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

140.   In addition, 42 U.S.C. § 1988 entitles the prevailing party in an action under § 1983 to recover attorneys' fees, court costs, and expert fees.

## A.   Unlawful Taking

141.   Under the Takings Clause of the Fifth Amendment, as applied to the states by the Fourteenth Amendment, "private property [shall not] be taken for public use, without just compensation."

142.   In broader terms even than the U.S. Constitution, article I, § 21 of the Nebraska Constitution states, "The property of no person shall be taken *or damaged* for public use without just compensation therefor" (emphasis supplied).

143.   A property owner has an actionable takings claim when the government takes the owner's property without paying for it. *Knick v. Twp. of Scott*, __ U.S. __, 139 S. Ct. 2162, 2167-68 (2019).

144.   A government's permanent physical invasion of any amount of private property is a categorical or *per se* taking. *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1374 (8th Cir. 2022); *Strode v. City of Ashland*, 295 Neb. 44, 62, 886 N.W.2d 293, 307 (2016).

145.   A government regulation that denies all economically beneficial or productive use of land is a taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *see Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 303, 332 (2002).

146.   A government regulation that requires landowners to allow access to third parties is a taking. *Cedar Point Nursery v. Hassid*, __ U.S. __, 141 S. Ct. 2063, 2072-74 (2021).

147.   L&J has a protected property interest in the Property, its appreciated value, use of the Property for leasable mobile-home spaces, and profit therefrom.

148.   The City's actions constitute a taking and damaging of the L&J's property rights.

149.   The City's taking is unlawful under Neb. Rev. Stat. § 76-710.04(1), because it "is primarily for an economic development purpose."

150.    The City's taking is unlawful because the City has provided no compensation and has failed to institute condemnation proceedings.

**B.    Deprivation of Due Process and Denial of Equal Protection**

151.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law."

152.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

153.    In addition, under Article I, § 3 of the Nebraska Constitution, "No person shall be deprived of life, liberty, or property, without due process of law, nor be denied equal protection of the laws."

154.    An arbitrary and unreasonably discriminatory special assessment is a *per se* deprivation of due process and denial of equal protection. *Rd. Imp. Dist. No. 1 of Franklin Cnty., Ark. v. Missouri Pac. R. Co.*, 274 U.S. 188, 190 (1927).

155.    The City has deprived L&J of the use of the Property without notice and the opportunity to be heard.

156.    The City has violated state law and its own rules for levying special assessments, collecting liens, and permitting the development of property subject to a special assessment.  State and local law limit the City's discretion in these matters.

157.    Bellevue, and indeed Nebraska, experienced widespread flooding in 2019.  But only the Mobile Homes were singled out for condemnation and "demolition & removal of debris," and only the Property was singled out for special assessment and threatened foreclosure as a result of the flooding.

158.    Upon information and belief, L&J is the only person or property owner out of hundreds or thousands to which the City has denied the benefit of state and local law.

159.    L&J constitutes a "class of one."

160.   There is no rational basis for the disparate treatment between L&J and other persons or property owners.   L&J is being specifically targeted.

161.   The City's actions have deprived L&J of procedural and substantive due process and denied L&J of equal protection of the laws.

## C.   Unconstitutional Condition

162.   Under the doctrine of "unconstitutional conditions," the government may not require a person to give up a constitutional right in exchange for a benefit conferred by the government where the benefit sought has little or no relationship to the property at issue.   *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994).

163.   An exaction is presumptively an unconstitutional taking unless it (i) bears an essential nexus to the substantial advancement of some legitimate government interest and (ii) is roughly proportional to the projected impact of the proposed development.   *Simpson v. City of N. Platte*, 206 Neb. 240, 244, 292 N.W.2d 297, 301 (1980).

164.   An excessive monetary exaction also deprives the property owner of due process.   *Main St Properties LLC v. City of Bellevue, Nebraska*, No. 8:20CV278, 2021 WL 736711, at *3 (D. Neb. Feb. 25, 2021), *citing Bituminous Materials, Inc. v. Rice City*, 126 F.3d 1068, 1070 (8th Cir. 1997); *see E. Enterprises v. Apfel*, 524 U.S. 498, 539-549 (1998) (Kennedy, J., concurring in judgment).

165.   The unlawful special assessment lacks any nexus and is grossly disproportionate to L&J's preparation and use of the Property for affordable housing.

166.   In essence, after pocketing FEMA's reimbursement grant, the City has held L&J's project hostage for two years and counting, demanding an unwarranted and illegal payoff of $1,000,000 to $3,000,000 before the City will even consider allowing L&J to make any economical and beneficial use of its private property.

167.   The City's actions have effected an unconstitutional taking and unconstitutional condition, have deprived L&J of procedural and substantive due process, and have denied L&J of equal protection of the laws.

168. The City knew or should have known that its actions violated well-established law and constitutional principles.

169. To vindicate its constitutional rights, this Court should award L&J damages, attorneys' fees, court costs, and any expert fees.

## DEMAND FOR JURY TRIAL

170. L&J hereby demands a trial by jury on all claims so triable.

171. Pursuant to NE Civ. R. 40.1(b), L&J requests the trial be held in Omaha, Nebraska.

## PRAYER FOR RELIEF

L&J respectfully requests that this Court enter a judgment in L&J's favor and award the following relief:

A. Declare the special assessment void because it exhibits actual or constructive fraud, a fundamental defect, a lack of jurisdiction, or a significant disconnect between the amount specially assessed and the benefit to the property conferred;

B. Declare that the special assessment is of no force against the Property and cannot form the basis of any lien;

C. Enjoin the City and all of its agents, representatives, and political tribunals from levying or attempting to specially assess or otherwise levy any costs related to the Mobile Homes or for any other alleged cleanup on the Property following the 2019 flooding;

D. Direct the City to cancel the special assessment on its records and notify the Sarpy County Treasurer to do the same;

E. Quiet title in the Property against any lien, including any lien based on the special assessment;

F. Award L&J all damages, as allowed by law, in amounts to be proven at trial;

G. Award L&J all attorneys' fees, court costs, and any expert fees, as allowed by 42 U.S.C. § 1988, Neb. Rev. Stat. § 76-296, and other applicable law; and

H.    Grant such other and further relief as this Court deems just and proper.

Dated this 31st day of January, 2023.

> L&J ASSET HOLDINGS, LLC, Plaintiff,
>
> By:   /s/ Kenneth W. Hartman
>       Kenneth W. Hartman (NE# 21954)
>       Vanessa A. Silke (NE# 25105)
>       Hannes D. Zetzsche (NE# 27115)
> of   BAIRD HOLM LLP
>       1700 Farnam Street, Suite 1500
>       Omaha, NE 68102-2068
>       Phone: 402-344-0500
>       Email: khartman@bairdholm.com
>       Email: vsilke@bairdholm.com
>       Email: hzetzsche@bairdholm.com
>       Attorneys for Plaintiff